UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CATHERINE MASSACANI, | ) | |
| Plaintiff, | ) | Civil Action No. 3:16-cv-30069-KAR |
| | ) | |
| v. | ) | |
| | ) | |
| KELLY SERVICES, INC., | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 47)

ROBERTSON, U.S.M.J.

## I.      Introduction

Catherine Massacani ("Plaintiff") has filed a complaint against Kelly Services, Inc.

("Defendant" or "Kelly") alleging state law claims under the Massachusetts Anti-Discrimination

Statute, Mass. Gen. Laws. ch. 151B ("Chapter 151B") for disability discrimination (Count 1),

failure to accommodate (Count 2), retaliation (Count 3), and age discrimination (Count 4).

Defendant has moved for summary judgment on all counts of the complaint (Dkt. Nos. 47-48).

Plaintiff opposed the motion as to all counts save her claim of age discrimination (Dkt. No. 50),

and Defendant replied (Dkt. No. 60).  The parties have consented to this court's jurisdiction

(Dkt. No. 11).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons stated herein,

Defendant's motion for summary judgment is denied as to Counts 1, 2, and 3 of her complaint

alleging disability discrimination, failure to accommodate, and retaliation, respectively.  Because

Plaintiff does not oppose Defendant's motion for summary judgment as to Count 4 of her

complaint alleging age discrimination, summary judgment shall enter for Defendant with respect

to that claim.

## II.    Standard of Review

"Summary judgment is proper where 'the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (quoting Fed. R. Civ. P. 56(c)).  "A factual dispute is 'genuine' if 'it may reasonably be resolved in favor of either party' and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" *DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990)).  "[A] fact is 'material' 'if its existence or nonexistence has the potential to change the outcome of the suit.'" *Jarvis v. Village Gun Shop, Inc.*, 805 F.3d 1, 7 (1st Cir. 2015) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).

In ruling on summary judgment, the court "view[s] 'the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" *Padilla-García v. Guillermo Rodríguez*, 212 F.3d 69, 73 (1st Cir. 2000) (quoting *Euromotion, Inc. v. BMW of N. Am., Inc.*, 136 F.3d 866, 869 (1st Cir. 1998)).  A party seeking summary judgment is responsible for identifying those portions of the record, "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden "either by offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325).  If the moving party meets its burden, "'the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Sensing v. Outback Steakhouse of*

*Fla., LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Carroll*, 294 F.3d at 236). "'[T]he nonmoving party "may not rest upon mere allegations or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which he would bear the ultimate burden of proof at trial."'" *Id*. (second alteration in original) (quoting *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997)). "'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."'" *Id*. at 152-53 (quoting *DeNovellis*, 124 F.3d at 306).

### III.    Facts[1]

Plaintiff began working for Defendant in March 2012 (Dkt. No. 47 at ¶ 1). Plaintiff was the only employee in Defendant's Pittsfield, Massachusetts office, and she was responsible for finding customers and placing temporary employees with those customers (Dkt. No. 47 at ¶ 3). Plaintiff's initial district manager was Brad Drakers (Dkt. No. 47 at ¶ 5). In January 2013, Pamela Mendes ("Mendes") became Plaintiff's new district manager (Dkt. No. 47 at ¶ 6). Mendes reported to regional vice-president Dawn Ford ("Ford") (Dkt. No. 47 at ¶ 9). The human resources manager responsible for supporting Kelly employees with human resources matters in Massachusetts during Plaintiff's employment was Tracy Hopper ("Hopper") (Dkt. No. 47 at ¶ 10).

---

[1] The recitation of the facts recounts the undisputed facts and the disputed facts in the light most favorable to Plaintiff, the nonmoving party. It is limited to those facts that are material to resolving Defendant's motion for summary judgment. The facts are drawn from Dkt. No. 47, Def.'s Motion for Summary Judgment, Dkt. No. 51, Pl.'s Statement of Disputed and Controverted Facts, and Dkt. No. 61, Def.'s Response to Pl.'s Statement of Disputed and Controverted Facts – to the extent that they are supported by the material in the summary judgment record – and from the documents referenced therein.

Plaintiff suffers from high blood pressure and periodically needs medical treatment to monitor or treat the condition (Dkt. No. 51 at ¶ 1).[2] Plaintiff advised Mendes of her condition and her need to have appointments three times per week to monitor it (Dkt. No. 47 at ¶¶ 18-19). Since Pittsfield was a one-person office, Plaintiff and Mendes agreed that Plaintiff would go to the medical appointments during her lunch hour (Dkt. No. 47 at ¶ 19; Dkt. No. 51 at ¶ 34). Plaintiff claims that, despite this agreement, Mendes refused to allow Plaintiff to attend those appointments on two occasions (Dkt. No. 51 at ¶ 35).

On February 14, 2013, at 1:43 p.m., Mendes sent an email to Hopper, copying Ford, in which she indicated that she and Ford wanted to get a Performance Improvement Plan ("PIP") in place for Plaintiff (Dkt. No. 47 at ¶ 37). Mendes's concerns about Plaintiff's performance included her technical capabilities using a computer, questionable judgment in professional decision-making, and not meeting minimum standards in filling orders for temporary employees (Dkt. No. 47 at ¶ 27). Later in the day on February 14, 2013, at 4:52 p.m., Plaintiff sent an email to Mendes advising Mendes that her blood pressure was 168 over 96 and that she was going home from work because she was not feeling well (Dkt. No. 47 at ¶ 20).[3]

Several weeks later, on March 7, 2013, Mendes sent an email to Hopper, again copying Ford, in which she set out a timeline of events relating to Plaintiff's performance issues (Dkt.

---

[2] Defendant faults Plaintiff for relying on her MCAD charge for this and other facts set forth in her L.R. 56.1 statement, arguing that Plaintiff's statements in the MCAD charge are merely allegations, not facts. However, in executing the MCAD charge, Plaintiff verified under the pains and penalties of perjury that the allegations contained therein were true to the best of her knowledge (Dkt. No. 50-11). Therefore, the court finds that the MCAD charge satisfies the requirements of Fed. R. Civ. P. 56(c)(4) and will consider the statements made therein for summary judgment purposes.

[3] While Mendes testified that this was "[p]ossibly" the first time she learned of Plaintiff's high blood pressure, Plaintiff maintains that she told Mendes of her condition earlier (Dkt. No. 47 at ¶ 20; Dkt. No. 51 at ¶ 36).

No. 47 at ¶¶ 38-39).  Mendes included an entry in her timeline regarding Plaintiff's February 14, 2013 email about needing to go home due to her high blood pressure (Dkt. No. 47 at ¶ 38). Hopper replied to Mendes's email by providing a template for a formal PIP (Dkt. No. 51 at ¶ 15). Hopper indicated that Mendes should feel free to draft the formal PIP, but she advised Mendes to "focus specifically on job related and [sic] tasks that [Plaintiff] is unable to perform, gaps in performance, missing deadlines, etc., and not include any sort of medical information . . . (as we know, those are not performance related factors)" (Dkt. No. 51 at ¶ 15).

On the morning of March 12, 2013, Plaintiff made an unscheduled visit to her healthcare provider due to a blood pressure reading of 160 over 110 (Dkt. No. 51 at ¶¶ 2-3).  Before the visit and before the start of her scheduled shift that day, Plaintiff sent Mendes a text message letting her know that she needed to see her healthcare provider due to her high blood pressure (Dkt. No. 51 at ¶ 4).  At the appointment, Plaintiff's blood pressure was 148 over 80, and Plaintiff's healthcare provider instructed Plaintiff not to return to work that day (Dkt. No. 47 at ¶¶ 15-16; Dkt. No. 51 at ¶ 5; Dkt. No. 61 at ¶ 5).

Following the appointment, Plaintiff called Mendes to advise Mendes of her need to be out of work for the day (Dkt. No. 51 at ¶ 6; Dkt. No. 61 at ¶ 6).  Mendes had yet to receive Plaintiff's text message about being out of the office and had been looking for Plaintiff after the office opened at 8:00 a.m. (Dkt. No. 47 at ¶¶ 53, 57).  According to Plaintiff, Mendes's initial response was to scream at Plaintiff, "I don't care about your blood pressure.  I expect you to work in fifteen minutes" (Dkt. No. 47 at ¶ 55; Dkt. No. 51 at ¶ 7).[4]  Then, in a threatening tone,

---

[4] Plaintiff cites to page 87 of her deposition transcript to support the assertion that Mendes screamed at her during this call.  Defendant argues that page 87 of Plaintiff's deposition does not support this assertion (Dkt. No. 61 at ¶ 7).  Defendant is correct; however, Plaintiff's testimony on page 86 does.

Mendes told Plaintiff, "go ahead and take the day off, and I'll take care of everything" (Dkt. No. 47 at ¶ 59; Dkt. No. 51 at ¶¶ 8-9; Dkt. No. 61 at ¶¶ 5, 8).[5]

Plaintiff reported Mendes's behavior to Defendant's human resources department that same day. According to Plaintiff, when she returned home from her medical appointment, she called Hopper and told Hopper what Mendes had said to her about not caring about her blood pressure and expecting her to be at work in fifteen minutes (Dkt. No. 51 at ¶¶ 10-11). Additionally, the record includes a March 12, 2013 email with a time stamp of 11:48 a.m. from Jessica Biauce, a human resources coordinator, to Hopper, in which Biauce advised Hopper that Plaintiff had "stated that she stayed home today due to high blood pressure and was given that directive by her doctor. She said that her DM stated that 'This behavior is intolerable and that there needs to be someone in the office at all times'" (Dkt. No. 47 at ¶ 61).

Later that day, at 1:56 p.m., Mendes emailed Hopper and Ford a document titled "First and Final for Lack of Integrity – Cathy Massacani;" Defendant maintains that this document is the PIP (Dkt. No. 47 at ¶ 35; Dkt. No. 51 at ¶ 13; Dkt. No. 61 at ¶ 13). The document is addressed to Plaintiff from Mendes and indicates that it is intended "to communicate our concerns regarding your recent communications and lack of integrity" (Dkt. No. 47 at ¶ 35; Dkt. No. 51 at ¶ 13; Dkt. No. 61 at ¶ 13). Included among the items listed in bullet point format thereafter is the entry from Mendes's March 7, 2013 timeline regarding Plaintiff's February 14,

---

[5] Plaintiff supports the assertion that Mendes made this statement in a threatening tone with an affidavit that she submitted in conjunction with her opposition to Defendant's motion for summary judgment. Defendant objects to Plaintiff's characterization of Mendes's tone as "subjective" and contrary to sworn testimony from her deposition (Dkt. No. 61 at ¶ 9). Defendant's objections are ill-founded. Plaintiff's representation does not contradict earlier sworn testimony, and Plaintiff is qualified as a percipient witness to testify as to her perception of Mendes's tone during the call.

2013 email about needing to go home due to her high blood pressure (Dkt. No. 51 at ¶ 14; Dkt. No. 61 at ¶ 14).

And yet later that day, at 4:36 p.m., Hopper forwarded Biauce's email to Plaintiff, stating:

> In speaking with [Mendes] about this matter, not only has she denied stating such to you – she has sent you a very sincere follow up email stating the importance of regaining your health and making it a priority. . . . . [S]he has articulated to you (both verbally and written), that she would like you to make it a focus for you to get well and will make appropriate accommodations to you as necessary.

(Dkt. No. 47 at ¶ 62).

Two days later, on March 14, 2013, Hopper called Plaintiff and told her, "We are working on an exit strategy for you. Your last day of work will be Friday, March 15" (Dkt. No. 51 at ¶ 16; Dkt. No. 61 at ¶ 16). Hopper indicated that the impetus for the "exit strategy" was that "they were concerned with [Plaintiff's] blood pressure and this would be best for both Kelly and [Plaintiff]" (Dkt. No. 51 at ¶ 16).[6]

The following day, March 15, 2013, Hopper, Ford, and Mendes met with Plaintiff, with Hopper and Ford participating by phone (Dkt. No. 51 at ¶¶ 18, 20; Dkt. No. 61 at ¶¶ 18, 20). During the meeting, Plaintiff was instructed to open an email containing a .PDF of a severance agreement that had been drafted by Defendant's legal department (Dkt. No. 51 at ¶ 22; Dkt. No.

---

[6] Defendant denies that Hopper made this statement and endeavors to establish that Plaintiff requested information about leaving her employment with Kelly, including a possible severance, because she did not want to work for Mendes and could not see a way for them to work together, nor did she want to be placed on a PIP (Dkt. No. 47 at ¶¶ 44, 70-76). Plaintiff denies requesting information about leaving her employment with Kelly and denies telling anyone at Kelly that she did not want to work for Mendes and could not see a way for them to work together (Dkt. No. 51 at ¶¶ 30-31). Since Plaintiff is the non-moving party, her version, which is properly supported by evidentiary material in the record, controls for summary judgment purposes.

61 at ¶ 22).  According to Plaintiff, Hopper instructed Plaintiff to sign the severance agreement (Dkt. No. 51 at ¶ 22).  When Plaintiff refused to sign it, she was instructed to give her keys to Mendes and leave the office (Dkt. No. 47 at ¶¶ 90-91; Dkt. No. 51 at ¶¶ 23-24; Dkt. No. 61 at ¶ 24).  Plaintiff testified that, as she was exiting the office, Hopper asked Plaintiff if she could hear her; when Plaintiff indicated that she could, Hopper said, "You quit your job.  That's our position, and we're sticking to it" (Dkt. No. 51 at ¶ 25).  Plaintiff's husband, William Massacani, was outside of the office at the time, and Plaintiff told him that she had just been terminated for health reasons (Dkt. No. 51 at ¶ 26; Dkt. No. 61 at ¶ 26).

In order to secure Plaintiff's replacement, Mendes prepared an internal Kelly document titled "Staffing Requisition;" in that document, Mendes indicated that Plaintiff's employment had been terminated (Dkt. No. 51 at ¶ 37; Dkt. No. 61 at ¶ 37).  Robert Romanelli, Defendant's general counsel, also represented that Plaintiff's employment had been terminated (Dkt. No. 51 at ¶¶ 38-39; Dkt. No. 51 at ¶¶ 38-39).  In contrast, Ford completed a Notice of Termination, in which she indicated that the termination of Plaintiff's employment was voluntary and that she had resigned after counseling (Dkt. No. 47 at ¶¶ 103-05).

On May 17, 2013, Plaintiff filed a single charge of disability discrimination with the Massachusetts Commission Against Discrimination ("MCAD") alleging that Defendant had violated the Americans with Disabilities Act ("ADA") and Mass. Gen. Laws ch. 151B ("Chapter 151B) on March 15, 2013 by firing her based on her high blood pressure (Dkt. No. 50-11).  On August 22, 2013, Plaintiff filed a reply to Defendant's Position Statement (Dkt. No. 50-10).  On November 2, 2015, the MCAD issued a probable cause determination (Dkt. No. 50-15).  Plaintiff initiated this action in state court on March 15, 2016, claiming that the termination of her

employment violated Chapter 151B (Dkt. No. 1-1). Defendant removed the action to this court on April 27, 2016 (Dkt. No. 1).

## IV. Discussion

### A. <u>Applicable Law</u>

Plaintiff brings her claims under Chapter 151B, which prohibits an employer from discriminating against a person on the basis of handicap. Mass. Gen. Laws ch. 151B, § 4(16). It provides in pertinent part:

> It shall be an unlawful practice . . . [f]or any employer . . . to dismiss from employment . . . or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business.

*Id*. The law defines the term "handicap" to mean "(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment . . . ." *Id*. at § 1 (17).

"[H]andicapped person" means "any person who has a handicap." *Id*. at § 1 (19). A "qualified handicapped person" means "a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap." *Id*. at § 1 (16). Chapter 151B also makes it unlawful for an employer to "discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter." *Id*. at § 4(4).

"Chapter 151B is considered the 'Massachusetts analogue' to the federal American's with Disabilities Act ('ADA')." *Sensing*, 575 F.3d at 153 (citing *Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C.*, 258 F.3d 30, 32 & n.1 (1st Cir. 2001)). "As a result, '"[t]he

Supreme Judicial Court of Massachusetts [("SJC")] has indicated that federal case law

construing the ADA should be followed in interpreting the Massachusetts disability law."'" *Id.*

at 153-54 (alterations in original) (quoting *Whitney*, 258 F.3d at 32 n.1).

B.  Count One: Disability Discrimination

In Count 1 of her complaint, Plaintiff alleges that Defendant discriminated against her on

the basis of her disability, in violation of Chapter 151B, by terminating her employment.  Proof

of disability discrimination can be direct or circumstantial.  *Patten v. Wal-Mart Stores E., Inc.*,

300 F.3d 21, 24-25 (1st Cir. 2002).  *See also Connolly v. Suffolk Cty. Sheriff's Dept.*, 815 N.E.2d

596, 603 n.6 (Mass. App. Ct. 2004).  "Direct evidence . . . 'consists of statements by a

decisionmaker that directly reflect the alleged animus and bear squarely on the contested

employment decision.'"  *Patten*, 300 F.3d at 25 (quoting *Febres v. Challenger Caribbean Corp.*,

214 F.3d 57, 60 (1st Cir. 2000)).  "Such evidence, if accepted by the factfinder, shifts the burden

of persuasion to the employer, who then must establish that he would have reached the same

decision regarding the plaintiff even if he had not taken the proscribed factor into account."

*Febres*, 214 F.3d at 60 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242 (1989)).  "The

presence of such direct evidence is sufficient to generate a jury issue on the question of a

possibly improper mixed-motive on Defendant's part."  *Katica v. Webster Bank, N.A.*, No. 13-

cv-30072-MAP, 2014 WL 3587383, at *8 (D. Mass. July 18, 2014) (citing *Price Waterhouse*,

490 U.S. at 228).  *See also Wynn & Wynn, P.C., v. Mass. Comm'n Against Discrimination*, 729

N.E.2d 1068, 1080 (Mass. 2000), *overruled on other grounds by Stonehill Coll. v. Mass.

Comm'n Against Discrimination*, 808 N.E.2d 205 (2004) (following the guidance of the Supreme

Court with respect to the allocation of burdens of proof in mixed-motive cases).

Where there is no direct evidence of discrimination, the SJC "uses a burden-shifting framework along the lines of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Sensing*, 575 F.3d at 154 (citing *Matthews v. Ocean Spray Cranberries, Inc.*, 686 N.E.2d 1303, 1308-09 (Mass. 1997)). *See also Cherkaoui v. City of Quincy*, 877 F.3d 14, 24 (1st Cir. 2017) ("[T]he SJC has consistently applied the three-step burden-shifting framework from *McDonnell Douglas Corp.* . . . to antidiscrimination suits under chapter 151B." (citing *Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 50 N.E.3d 778, 793 (Mass. 2016))). Under the familiar three-part framework, the plaintiff first must make a prima facie showing of handicap discrimination by offering evidence that (1) he or she is a "handicapped person" within the meaning of Chapter 151B; (2) he or she is a "qualified handicapped person" within the meaning of Chapter 151B; (3) he or she was terminated or otherwise subject to an adverse action by his or her employer; and (4) where the adverse action is termination, the position he or she had occupied remained open and the employer sought to fill it. *Gannon v. City of Boston*, 73 N.E.3d 748, 756 & n.5 (Mass. 2017). "Where the plaintiff employee makes this prima facie showing, the burden shifts to the employer to show with credible evidence that the real reason for the adverse employment action was not the employee's handicap but a lawful reason that was unrelated to the employee's handicap," such as insubordination, poor job performance, tardiness, or a reduction in force. *Id.* at 756. "Where the employer meets this burden, the burden shifts back to the plaintiff employee to prove that the adverse action was taken 'because of his [or her] handicap,' [Mass.] G[en]. Laws[ ] c[h]. 151B, § 4 (16), and not for the reason proffered by the employer." *Id.* at 756-57 (first alteration in original) (citations omitted).

Defendant argues that Plaintiff does not have direct evidence of discrimination. The court disagrees. Plaintiff has submitted evidence sufficient to constitute direct evidence of

discrimination. Plaintiff testified that Hopper called her on March 14, 2013 and told her that Defendant was working on an exit strategy for her out of concern over her high blood pressure. Hopper made this statement the day before Plaintiff was presented with a severance agreement and, when she refused to sign it, was told to turn over her keys and leave. Thus, the statement made by Hopper, who Defendant has failed to show lacked decision-making authority, "directly reflect[ed] the alleged animus and b[ore] squarely on the contested employment decision." *Febres*, 214 F.3d at 60. Moreover, even if Hopper were not a decisionmaker, a fair inference from Hopper's statement that "we are working on an exit strategy" is that Hopper was acting at the direction of a decisionmaker. Thus, if a jury accepted Plaintiff's testimony that Hopper made this statement, it would constitute direct evidence of discrimination and would satisfy Plaintiff's burden. *Id*. The burden would then shift to Defendant to show that it would have terminated Plaintiff regardless of her high blood pressure. *Id*. According to Defendant, Plaintiff's high blood pressure had nothing to do with her termination; the real reason it terminated Plaintiff's employment was because Plaintiff decided she could no longer work for Mendes (Dkt. No. 48 at p. 17). Plaintiff denies this. Because the question is one of fact, it is for a jury.

Defendant also argues that it is entitled to summary judgment under the burden-shifting framework both because Plaintiff cannot establish a prima facie case of discrimination and because Plaintiff cannot establish that Defendant's proffered justification is "'not only a sham, but a sham intended to cover up [disability] discrimination'" (Dkt. No. 48 at p. 16 (quoting *Tyree v. Foxx*, 835 F.3d 35, 41 (1st Cir. 2016)). With regard to Plaintiff's prima facie case, Defendant concedes for purposes of summary judgment that Plaintiff's high blood pressure constitutes a disability (the first element) and that the end of Plaintiff's employment with Defendant qualifies as an adverse employment action (the third element). While Defendant does not concede that

Plaintiff's position remained open and Defendant sought to fill it (the fourth element), it is uncontested that Mendes filled out the Staffing Requisition document to secure Plaintiff's replacement, thereby demonstrating the presence of a triable issue as to the fourth element. Defendant argues that Plaintiff cannot satisfy the second element of her prima facie case, which is to show that Plaintiff is a "qualified handicapped person" able to perform the essential functions of the job, either with or without reasonable accommodation. *Gannon*, 73 N.E.3d at 756.

The analysis of whether an employee is a "qualified handicapped person" is "generally broken into two steps: (1) whether the employee could perform the essential functions of the job; [and] (2) if not, whether any reasonable accommodation by the employer would enable him to perform those functions." *Ward v. Mass. Health Research Inst., Inc.*, 209 F.3d 29, 33-34 (1st Cir. 2000) (citations omitted). "An essential function is a 'fundamental job dut[y]' of the employment position the individual with a disability holds or desires." *Id.* at 34 (alteration in original) (quoting *Laurin v. Providence Hosp.*, 150 F.3d 52, 56-57 (1st Cir. 1998)). "[W]hether a particular job duty is an 'essential job function' is 'intensely fact-based,' requiring 'individualized inquiry and . . . appropriate findings of fact.'" *Godfrey v. Globe Newspaper Co., Inc.*, 928 N.E.2d 327, 334 (Mass. 2010) (second alteration in original) (quoting *Cargill v. Harvard Univ.*, 804 N.E.2d 377, 380 (Mass. 2004)). The employer bears the burden of proving that a given job function is an essential function. *Ward*, 209 F.3d at 35. The only function of Plaintiff's position that Defendant has identified is the responsibility to find customers and place temporary employees with those customers. Defendant has pointed to no evidence in the summary judgment record that demonstrates that Plaintiff's high blood pressure prevented her from performing this function. Instead, Defendant points to Mendes's concerns with Plaintiff's

performance and the initiation of the PIP process as evidence that Plaintiff was not performing her job in a satisfactory manner. While poor job performance may be an issue for Defendant to raise at the second stage of the burden shifting framework, it does not negate Plaintiff's ability to prove that she is a qualified handicapped person. Thus, Defendant has not met its burden of showing the absence of a genuine issue of material fact on this element of Plaintiff's prima facie case. *See Bulwer v. Mount Auburn Hosp.*, 46 N.E.3d 24, 34 (Mass. 2016) ("[T]he burden of persuasion at summary judgment remains with the defendants, who, 'as the moving part[ies], "ha[ve] the burden of affirmatively demonstrating the absence of a genuine issue of material fact on every relevant issue, even if [they] would not have the burden on an issue if the case were to go to trial."'" (all but first alteration in original) (quoting *Sullivan v. Liberty Mut. Ins. Co.*, 825 N.E.2d 522, 529 (Mass. 2005))).

Moreover, even if the record supported a finding that Plaintiff was incapable of performing an essential function of the position because of her high blood pressure, the inquiry would continue on to the issue of reasonable accommodation. "Once an employee 'make[s] at least a facial showing that reasonable accommodation is possible,' the burden of proof (of both production and persuasion) shifts to the employer to establish that a suggested accommodation would impose an undue hardship." *Godfrey*, 928 N.E.2d at 333-34 (alteration in original) (quoting *Cox v. New England Tel. & Tel. Co.*, 607 N.E.2d 1035, 1041 n.3 (Mass. 1993)). Here, the record reflects that the only accommodations that Plaintiff sought were to attend medical appointments during her lunch hour three times per week and to be out of work on March 12, 2013. Defendant has not shown that providing these accommodations would impose an undue hardship, financial or otherwise. To the contrary, Mendes and Plaintiff agreed that Plaintiff could go to her medical appointments during her lunch hour, Mendes advised Plaintiff to go

ahead and take the day off on March 12, 2013, and Defendant conceded that "an employee's need for time for a medical reason was an accommodation Kelly would make" (Dkt. No. 47 at ¶ 60). Accordingly, Defendant is not entitled to summary judgment based on a showing that Plaintiff is unable to make out a prima facie case of disability discrimination at the first stage of the burden-shifting framework.

Nor is Defendant entitled to summary judgment at the third stage of the burden-shifting framework. Contrary to Defendant's argument, "[t]o survive a motion for summary judgment, the plaintiff need only present evidence from which a reasonable jury could infer that 'the respondent's facially proper reasons given for its action against him were not the real reasons for that action.'" *Bulwer*, 46 N.E.3d at 33 (quoting *Wheelock Coll. v. Mass. Comm'n Against Discrimination*, 355 N.E.2d 309, 315 (Mass. 1976)). Plaintiff does not also need to show that the sham reasons were intended to cover up disability discrimination. *Id.* This is because where there are "disputed issues of fact as to whether the employer's proffered reason was not the true reason, [it may be inferred] that the employer offered a pretextual reason because the true reason was discrimination on the basis of handicap." *Gannon*, 73 N.E.3d at 757 (citing *Bulwer*, 46 N.E.3d at 33-34; *Blare v. Husky Injection Molding Sys. Boston, Inc.*, 646 N.E.2d 111, 117 (Mass. 1995))). Plaintiff satisfies this standard. Defendant's proffered reason for the adverse employment action is that Plaintiff decided she could no longer work for Mendes. Plaintiff has pointed to ample evidence in the summary judgment record from which a jury could conclude that this stated reason was pretextual. First, Plaintiff denies having decided that she could no longer work for Mendes or having any intention of quitting, and Defendant made multiple representations that Plaintiff's employment was terminated. Second, Plaintiff has identified two statements by Hopper that call into question Defendant's motivation. Plaintiff testified that

Hopper advised her on March 14, 2013 – only two days after Plaintiff had to be out of work for her high blood pressure and after Plaintiff complained to Defendant about Mendes's treatment of her as a result – that Defendant was working on an exit strategy for her due to her high blood pressure. Then, immediately after Plaintiff was told to turn in her keys and leave after she refused to sign a severance agreement on March 15, 2013, Hopper told Plaintiff that Defendant's story was she quit. Third, there is evidence that Mendes circulated a PIP, which she titled "First and Final for Lack of Integrity," on March 12, 2013, just hours after screaming at Plaintiff for needing to be out of work that day for her high blood pressure, and, in that document, Mendes included Plaintiff's need to leave work early on February 14, 2013 due to her high blood pressure as a concern. Finally, Plaintiff's employment ended on March 15, 2013, only three days after she had to miss work due to her high blood pressure and after she made her complaint about Mendes's treatment of her. Thus, there are disputed issues of fact as to whether Defendant's proffered reason why Plaintiff's employment ended was the true reason, from which a jury could infer that Defendant offered a pretextual reason to cover up disability discrimination. Accordingly, Defendant is not entitled to summary judgment on Plaintiff's disability discrimination claim.

## C. Failure to Accommodate

In Count 2 of her complaint, Plaintiff claims that Defendant failed to reasonably accommodate her disability in violation of Chapter 151B by not allowing her to attend necessary medical appointments during her lunch hour. As a preliminary matter, Defendant argues that Plaintiff failed to exhaust her administrative remedies on her claim of failure to accommodate because her MCAD charge did not specifically assert discrimination on the basis of failure to accommodate. "Under Massachusetts law, plaintiffs must first bring their discrimination claims

before the MCAD; otherwise their claims are barred." *Singleton v. Sinclair Broad. Grp., Inc.*, 660 F. Supp. 2d 136, 146 (D. Mass. 2009) (citing *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 464 (1st Cir. 1996)). "The purpose of the administrative filing is '(1) to provide the MCAD with an opportunity to investigate and conciliate the claim of discrimination, and (2) to provide notice to the defendant of potential liability.'" *Pelletier v. Town of Somerset*, 939 N.E.2d 717, 727 (Mass. 2010) (quoting *Cuddyer v. Stop & Shop Supermarket Co.*, 750 N.E.2d 928, 936 (Mass. 2001)). Courts use the "scope of the investigation" rule to determine if a plaintiff has sufficiently exhausted his or her claims. *Id.* "Under the 'scope of the investigation' rule, 'a claim that is not explicitly stated in the administrative complaint may be asserted in the subsequent . . . action so long as it is based on the acts of discrimination that the MCAD investigation could reasonably be expected to uncover.'" *Id.* (quoting *Everett v. 357 Corp.*, 904 N.E.2d 733, 748 (Mass. 2009)).

Here, Plaintiff's MCAD complaint is fairly sparse and is focused on the events of March 12, 2013 to March 15, 2013. While it does include an allegation that Mendes agreed that Plaintiff could go to medical appointments for her high blood pressure three times per week during her lunch hour, it does not allege that Defendant ever denied Plaintiff this particular accommodation. Nevertheless, the court finds that Plaintiff's MCAD complaint sufficed to exhaust her failure to accommodate claim. This is not a case in which a plaintiff seeks to add a claim based on a protected characteristic that was not identified in her MCAD charge. In the court's view, a reasonable investigation of a disability discrimination claim would include an examination into whether the plaintiff was afforded the very accommodation she identified in her MCAD complaint. The court's conclusion is bolstered by the fact that, so far as it appears from the record, Plaintiff was not represented by counsel at the time she filed her MCAD complaint. "In cases where . . . the employee acts *pro se*, the administrative charge is liberally construed in

order to afford the complainant the benefit of any reasonable doubt." *Lattimore*, 99 F.3d at 464 (citations omitted). Thus, Defendant's motion, to the extent it argues that Plaintiff failed to exhaust her failure to accommodate claim, is denied.

Turning to the substance of the claim, a disability discrimination claim based upon a failure to accommodate requires a plaintiff to show that: "(1) she is a handicapped person within the meaning of the statute; (2) she is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the employer knew of her disability but did not reasonably accommodate it upon a request." *Henry v. United Bank*, 686 F.3d 50, 59-60 (1st Cir. 2012) (citing *Faiola v. APCO Graphics, Inc.*, 629 F.3d 43, 47 (1st Cir. 2010)). As discussed above, Defendant has not contested that Plaintiff is a handicapped person, and the court has held that Defendant has not met its summary judgment burden of demonstrating the absence of a genuine issue of material fact as to whether Plaintiff is a qualified handicapped person. Turning to the third element, Defendant maintains that Plaintiff cannot establish that she was denied a requested reasonable accommodation. The court disagrees. Viewing the summary judgment record in the light most favorable to Plaintiff, as the court must, it reveals that Plaintiff advised Mendes of her high blood pressure, that Plaintiff sought as an accommodation to attend medical appointments three times per week during her lunch hour to have her blood pressure monitored, and that Mendes, despite agreeing she could do so, prevented her from going to those appointments on two occasions. This evidence is sufficient to create a triable issue on Plaintiff's claim of failure to accommodate. Defendant faults Plaintiff for not having medical records to support her testimony that Mendes prevented her from going to two of her appointments. The lack of corroborating records may well affect a factfinder's assessment of Plaintiff's credibility,

but Plaintiff does not need such records to survive summary judgment. Her testimony suffices to create a genuine issue of material fact.

### D. Retaliation

In Count 3 of her complaint, Plaintiff claims that Defendant retaliated against her, in violation of Chapter 151B, by terminating her employment as a result of her engaging in protected activity.[7] Plaintiff's retaliation claim is governed by the *McDonnell Douglas* three-stage burden-shifting framework. *Cherkaoui*, 877 F.3d at 28 (citing *Pina v. Children's Place*, 740 F.3d 785, 800 (1st Cir. 2014)).

> To establish a prima facie case of retaliation, Plaintiff must "show that (1) she undertook protected conduct; (2) she suffered an adverse employment action, and (3) the two were causally linked." *Noviello v. City of Boston*, 398 F.3d 76, 88 (1st Cir. 2005); *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 25 (1st Cir. 2004). Once Plaintiff has made a prima facie showing of retaliation, "[D]efendant must articulate a legitimate, non-retaliatory reason for its employment decision. *Id*. at 26. "If the [D]efendant meets this burden, then [P]laintiff must show that the proffered legitimate reason is pretextual and that 'the job action was the result of the [D]efendant's retaliatory animus.'" *Kelly v. Corr. Med. Servs., Inc.*, 707 F.3d 108, 115 (1st Cir. 2013) (quoting *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993)).

*Id*. (alterations in original).

In terms of her prima facie case, Plaintiff contends that she engaged in protected activity when she requested the reasonable accommodations of going to medical appointments three times per week during her lunch hour and for time off on March 12, 2013, and when she complained about Mendes's treatment of her as a result of needing to be out of work on March

---

[7] Defendant argued in its memorandum of law in support of its motion for summary judgment that Plaintiff failed to exhaust her administrative remedies for her retaliation claim. However, at oral argument on the motion, Defendant conceded that Plaintiff had exhausted her administrative remedies on the retaliation claim in light of the fact that the MCAD *sua sponte* amended the complaint to allege that Plaintiff was subjected to retaliation.

12, 2013.  Both requests for reasonable accommodation and complaints regarding discrimination are protected activity.  *Verdrager*, 50 N.E.3d at 801 (citing *Abril-Rivera v. Johnson*, 806 F.3d 599, 608 (1st Cir. 2015)); *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 87 (1st Cir. 2016).[8] Moreover, as set forth above, Defendant does not contest that Plaintiff suffered an adverse employment action on March 15, 2013.  This leaves only the element of causation.  As evidence of causation, Plaintiff points to the temporal proximity between her request for accommodation on March 12, 2013, and her complaining about Mendes's conduct after she requested that accommodation, on the one hand, and her termination on March 15, 2013, on the other.  The extremely close timing between these events is sufficient to establish a prima facie case of retaliation.  *Cherkaoui*, 877 F.3d at 28-29 ("'The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close"'" (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001))); *Katica*, 2014 WL 3587383, at *11.  Thus, Defendant is not entitled to summary judgment at the first stage of the burden shifting framework.

Nor is Defendant entitled to summary judgment at the third stage of the burden shifting framework.  Again, Defendant's proffered reason for terminating Plaintiff's employment is that Plaintiff decided she could no longer work with Mendes.  For the same reasons discussed above in connection with Plaintiff's disability discrimination claim, Plaintiff has pointed to sufficient evidence in the summary judgment record from which a jury could determine that Defendant's facially valid reason was not the real reason for the adverse action, which would support an

---

[8] Defendant complains that the record does not contain any formal request for an accommodation or medical documentation indicating that an accommodation was required, but cites to no authority for the proposition that such evidence is necessary.

inference that the proffered reason was a pretext to cover up unlawful retaliation.  *Gannon*, 73

N.E.3d at 757; *Bulwer*, 46 N.E.3d at 33-34.  Accordingly, Defendant is not entitled to summary

judgment on Plaintiff's retaliation claim.

## V.    Conclusion

For the reasons stated herein, Defendant's motion for summary judgment is DENIED as

to Counts One, Two, and Three of Plaintiff's complaint and GRANTED as to Count Four of

Plaintiff's complaint.

It is so ordered.

January 16, 2018                                    /s/ Katherine A. Robertson
                                                   KATHERINE A. ROBERTSON
                                                   United States Magistrate Judge